IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RICHARD JOHN KALTENBERG, MARY BETH
KALTENBERG and ZIEGLER DAIRY FARMS, INC.,

                 Plaintiffs,                        OPINION and ORDER

   v.

                                                 22-cv-198-wmc

COUNTY OF DANE,

                 Defendant.

---

This case arises out of Dane County's creation of three stormwater detention ponds located directly across the street from farmland owned by plaintiffs Richard and Mary Kaltenberg and Ziegler Dairy Farms, Inc.  Plaintiffs allege that water escaping from a breach in the bottom of the detention ponds recharged a previously confined aquifer beneath the ponds, causing groundwater to travel to their property, saturate the soil and pool on their land.  As a result, plaintiffs suffered several, unsuccessful growing seasons before installing field drain tile that fixed the problem.  Plaintiffs filed this lawsuit against the County, claiming its construction of the detention ponds (1) worked a taking of their land without compensation in violation of United States and Wisconsin Constitutions, and (2) created a private nuisance in violation of state law.

Dane County has moved for summary judgment on all of plaintiffs' claims.  (Dkt. #12.)  Having failed to offer evidence from which a reasonable jury could find that the County intended to damage plaintiffs' property or that the damage was a foreseeable consequence of clay extraction activities used to create the detention ponds, plaintiffs cannot succeed on their takings claim under the 5th and 14th Amendments or Wisconsin Constitution.  Thus, the

court will grant summary judgment to the County on plaintiffs' takings claims and decline to exercise supplemental jurisdiction over the remaining state law claim.

UNDISPUTED FACTS[1]

**A.  Plaintiffs' and County's Properties**

The properties at issue in this case are located in the Town of Vienna in Dane County, Wisconsin.  Below is an aerial photo of the properties, showing Dane County's property and three detention ponds directly south of Easy Street, the Kaltenbergs' property to north and west, adjacent to farm buildings on the far left, which runs prominently east/west in the center of the photo dividing it from Ziegler Farm's property to north and east.

**Kaltenburg Property          Ziegler Farms Property**

**Dane County Property**

---

[1] Except where noted, the following facts are undisputed as drawn from the parties' proposed findings of fact and responses when viewed in the light most favorable to the plaintiffs, as the nonmoving parties.

During the relevant time period, the Kaltenbergs owned 149 acres of cropland in the area,[2] on which they regularly planted corn or alfalfa and raised cattle.  This litigation concerns the 10 acres in the southeastern corner of the property immediately adjacent to the north side of Easy Street, which generally rises northward from the southeast corner.  Until 2015, falling rain did not generally pool in this 10-acre area, but instead drained to the southeast corner of the parcel, then to a ditch along the north side of Easy Street.

Ziegler Dairy Farms owns approximately 74 acres of cropland immediately east of the Kaltenbergs' land.  Like the Kaltenbergs, Ziegler uses its land for farming purposes, regularly planting corn or soybeans on his fields.  This litigation concerns roughly 25 acres of Ziegler's land in the southern part of its property, adjacent to the Kaltenbergs and Easy Street.  Approximately five acres of the 25 acres at issue are wetlands on which Ziegler did not plant crops.

**B.  Dane County's Clay Excavation Project**

Beginning in 2014, the County began excavating clay from its land just south of Easy Street for use in the construction of a landfill liner located elsewhere in the county.[3]  This excavation work eventually resulted in the creation of three stormwater detention ponds on the County's land, running roughly parallel to Easy Street.  The eastern-most pond was excavated in 2014; the middle pond in 2017; and the western pond in 2020.  According to

---

[2] The Kaltenbergs no longer own the land, having sold it in December of 2021 for approximately $3.1 million, including the 10 acres at issue here.  Since they owned the land during the relevant period, however, the court continues to refer to the property as the Kaltenbergs' in this opinion.

[3] The Wisconsin Department of Natural Resources only allows for very specific, solid clay soils to be used for a landfill liner.  Wis. Admin. Code DNR 504.06(2)(a).

John Welch, the County official responsible for implementation, the clay excavation project should have resulted in the bottoms of all three retention ponds remaining solid clay. (Welch Aff. (dkt. #20) ¶ 12.) The County also installed diversion and grass swales on the southeast portion of the site, to divert water to the northeast and into the ponds to prevent erosion. As one of the most common stormwater management strategies, there are thousands of similar stormwater detention ponds in use and managed by both public and private landowners across Dane County.

## C. Water Problems on Plaintiffs' Lands

Before 2015, the Kaltenbergs' 10-acre parcel north of Easy Street drained well, and the Kaltenbergs did not experience lost or damaged crops due to soggy soils. Starting in 2015 or 2016, however, the Kaltenbergs noticed water springing up from beneath the soil and pooling on their fields. This wet soil yielded less and poor-quality corn, resulting in reduced harvests and lost income. Similarly, Ziegler Dairy Farms had planted corn successfully on the 25-acre parcel at issue from 2010 to 2014. In 2015 and 2016, however, Ziegler's the corn on that parcel was also water-damaged and of low quality. Moreover, the 25-acre parcel was too wet to plant at all from 2017 to 2021.

Richard Kaltenberg and Greg Ziegler, the president of Ziegler Dairy Farms, contacted Dane County in August of 2020 to ask whether someone could visit their properties to discuss water concerns.[4] On August 28, 2020, County officials, including Jeremy Balousek of Dane

---

[4] Richard Kaltenberg says he also complained to someone at the front desk of Dane County Land and Water Resources about the water problems on his 10-acre parcel in June 2017, but he (1) did not know then that the problems were caused by the stormwater detention ponds at the time and

County Land and Water Resources, met with Kaltenberg, Ziegler and Paul Haag, a crop consultant for the Kaltenbergs. During this visit, County staff were shown numerous areas of wet soil and standing water on the Kaltenberg and Ziegler properties, including areas where cattails were growing. Following this visit, County officials advised Kaltenberg and Ziegler to install field tiles to drain the stormwater detention ponds across Easy Street, but that the County would not pay for installation because the condition in their fields were consistent with those throughout the county and most likely caused by historic rainfall volumes and high groundwater levels. When asked about the County's detention ponds across the street, Kaltenberg specifically recalls Balousek stating that in excavating to obtain clay, the County had excavated until "they reached the sand layer below, at which time they stopped excavating." (Kaltenberg Aff. (dkt. #29) ¶ 10.)

In November 2021, the Kaltenbergs and Ziegler installed field tiles on their properties. Since then, there has been no issues with the pooling of water or saturated soil on their fields.

OPINION

Plaintiffs contend that Dane County's clay excavation activities and stormwater detention ponds caused the water seepage and pooling on their properties, resulting in a takings in violation of the Fifth Amendment to the United States Constitution. They also contend that Dane County's actions violated the Wisconsin Constitution and state nuisance law. The court will first address the federal claim before considering the state law claims.

---

(2) did not talk to any county officials. Nor did he follow up with Dane County again until August 2020.

## I.  Fifth Amendment Takings Claim

The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V.   The purpose of this provision is to prevent the government, including through the Fourteenth Amendment, state and local government, from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012) (citation omitted).  The Fifth Amendment protects against government actions that completely deprive owners of all economically beneficial use of their property, such as a permanent physical occupation of property.  *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 332 (2002).  Examples of physical takings include: formally condemning a property through the power of eminent domain, *United States v. Gen. Motors Corp.*, 323 U.S. 373, 374–75 (1945); taking possession of property without acquiring title, *United States v. Pewee Coal Co.*, 341 U.S. 114, 115–17, (1951); or even by recurrent flooding as a result of the building of locks and dams, *United States v. Cress*, 243 U.S. 316, 328 (1917).  These sorts of physical appropriations constitute the "clearest sort of taking." *Palazzolo v. Rhode Island*, 533 U. S. 606, 617 (2001).  The Fifth Amendment also prohibits some temporary invasions or injuries that diminish property values caused by a government action or regulation.  *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005); *Goodpaster of City of Indianapolis*, 736 F.3d 1060, 1070–71, 1074–75 (7th Cir. 2013).

 However, "not every destruction or injury to property by governmental action is a 'taking' in the constitutional sense." *Armstrong v. United States*, 364 U.S. 40, 48 (1960).  In particular, damage resulting from government action does not constitute a taking if it is "only

incidental" to the government's action. *See Yawn v. Dorchester Cnty.*, 1 F.4th 191, 195 (4th Cir. 2021) (citing *Chicago, B. & Q. Ry. Co. v. Illinois*, 200 U.S. 561, 593–94 (1906) ("If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution.").)   Similarly, if a government invasion is only temporary, a plaintiff "must establish that treatment under takings law, as opposed to tort law, is appropriate under the circumstances." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003).   This requires "a more complex balancing process" and consideration of case-specific facts to determine whether the government invasion was a Fifth Amendment takings. *Arkansas Game & Fish Comm'n,* 568 U.S. at 36.

Here, the evidence establishes that the alleged taking was a temporary and partial invasion of plaintiffs' property.   Specifically, there is no genuine dispute that the water saturation and pooling on plaintiffs' property was seasonal, affected only a portion of their property, and has been resolved since the installation of field tiles in 2021.   Having removed this action from state court, the County principally argues at summary judgment that its clay extraction and stormwater detention activities, even if a cause of the seepage and pooling on plaintiffs' lands, were not "takings" of plaintiffs' property under the Fifth Amendment.

The parties agree that the United States Supreme Court's analysis in *Arkansas Game* is most applicable here, though they disagree how it should affect the outcome.   That case involved the Army Corps of Engineers' operation of a dam upstream from hardwood forests managed by the Arkansas Game and Fish Commission, with the Corps controlling the rate of water that was released from the dam.  568 U.S. at 27.  For several years, the Corps deviated from its planned water-release rates to benefit farmers and recreational users below the dam,

which caused flooding, saturated soil and weakened root systems of trees, and interfered with the growth of hardwood trees managed by Arkansas Game and Fish to the point that more than 18 million board feet of timber were destroyed. *Id.* at 27–28.  While the Corps eventually returned to more normal water release rates, Arkansas Game and Fish argued that the temporary flooding over a six-year period constituted a taking that entitled it to just compensation. *Id.* at 29.  In concluding that government-induced "recurrent floodings, even if of a finite duration, are not categorically exempt from Takings Clause liability," *id.* at 27, the Supreme Court identified five criteria relevant to analyzing whether government-induced flooding results in a compensable taking of a property interest.  568 U.S. at 36.  Those factors are: (1) the degree to which the invasion is intended or is the foreseeable result of an authorized government action; (2) the duration of the invasion; (3) the severity of the interference; (4) the character of the land at issue; and (5) the owner's reasonable expectations regarding the land's use.

Applying the *Arkansas Game* factors to this case establishes that the water saturation on plaintiffs' property was not a compensable taking under the Fifth Amendment.[5]  First, and most importantly, plaintiffs have failed to advance evidence sufficient for a reasonable trier of fact to find the seepage and pooling on plaintiffs' land was intentional or foreseeable.  The County's objective was to extract clay from its property to build a landfill liner and create stormwater detention ponds to control stormwater runoff.  There is no evidence that the County intended to change the groundwater levels, create a recharge area for a previously

---

[5] Although the water invasion in this case was allegedly caused by groundwater seepage, and not flooding, the court agrees with the parties that the five *Arkansas Game* factors readily apply to the circumstances here as well.  (Plts.' Br. (dkt. #23) 24; Dft.'s Br. (dkt. #21) 18.)

confined groundwater aquifer, or change the direction of groundwater flow in a way that would result in saturation of soils on plaintiffs' properties.

These circumstances differ significantly from those in *Arkansas Game*, in which the Corps of Engineers constructed a dam, then intentionally altered the release of water from the dam, *and* continued to do so for several years despite notice from Arkansas Game and Fish that the resulting flooding was harming its timber resources. Thus, even if not intentional, the Corps should certainly have foreseen the damage to the hardwood forests would result with any kind of "reasonable investigation." *Arkansas Game & Fish Com"n v. United States*, 736 F.3d 1364, 1373 (Fed. Cir. 2013). In contrast, Dane County did not intentionally release any water onto plaintiffs' land, nor did plaintiffs or anyone else notify the County that the stormwater detention ponds were causing problems on plaintiffs' land until August 2020, several years after the clay extraction project had started and when it was close to completion.

Plaintiffs concede that the County did not intend to flood their lands but argue that water pooling and saturation on their properties was nonetheless foreseeable based on "standard principals of hydrogeology." (Plts.' Br. (dkt. #23) 32.) As support, they point the court to an expert report of Robert Nauta, a hydrogeologist retained by plaintiffs, who concluded that the County's contractors excavated through the clay layer and into a sandy, porous layer below the clay. In doing so, Nauta opines that the County converted the existing confined aquifer trapped below the clay into an unconfined aquifer, allowing stormwater that flowed into the detention ponds to then flow into the aquifer below the clay layer, and under pressure, then flow northwards under Easy Street and up into plaintiffs' fields. (Nauta Rep. (dkt. #30-2).) In response to the County's summary judgment brief, Nauta also provided a supplemental report stating that "this induced flow regime should have been a foreseeable

9

occurrence" for three reasons: (1) a 1989 report from a company called "Warzyn Engineering" noting that groundwater had seeped into test pits and was present beneath clay; (2) a photo of the Dane County sites from August 2014 that show "dewatering equipment" on site, suggesting that County contractors had to drain the basin of water during excavations; and (3) "an elementary hydrogeological conclusion that a groundwater flow gradient would be created, inducing groundwater flow." (Nauta Supp. Rep. (dkt. #30-3) 5.)[6]

None of this evidence nor Nauta's resulting opinions is sufficient to create a genuine factual dispute regarding foreseeability. As an initial matter, Nauta neither provides any elaboration about the Warzyn Engineering report nor its relevance to this case. Nor does he explain *why* the mere presence of "dewatering equipment" at the clay extraction site would allow a reasonable inference that the County understood that it could pierce an underground aquifer, alter groundwater flow direction, and flood plaintiffs' property; as opposed to the equipment simply being present to drain rainwater that gathered in the detention basins. Indeed, the fact remains that the excavations were not intended by the County to pierce the naturally formed, clay liner that was intended to *detain* storm water in the three ponds left behind; nor have plaintiffs offered *any* evidence that the clay lining forming the bottom of the three pools was actually pierced in excavation, save for a stray remark by a single County official.

Finally, Nauta's opinion that the County should have foreseen the pooling on plaintiffs' property based on "elementary hydrogeological" principals is simply an unsupported

---

[6] The County recently filed a motion to exclude Nauta's opinions on various grounds. (Dkt. #44.) However, because the court is granting summary judgment to the County on plaintiffs' federal takings claim and remanding the remaining claims, the court need not resolve that motion.

conclusion.  He cites *no* studies, reports or other evidence that lands containing stormwater detention ponds in the vicinity (or anywhere else for that matter) have caused such water-soaking events; nor does he cite any industry standards for building stormwater detention ponds; nor even offer examples where detention ponds built with permeable bottoms lead to outcomes such as that allegedly occurred here.  Similarly, neither Nauta nor plaintiffs offer any evidence that the water pooling and saturating their property was not best explained by the historically high rainfall and flooding that cause similar problems to farm fields throughout Dane County.

In sum, plaintiffs have submitted *no* admissible evidence for a reasonable trier of fact to conclude that the County intended or should have foreseen that water would escape the bottom of the County's detention ponds, flow underground in the opposite direction of the natural groundwater flow, and eventually come up through the clay soil under plaintiffs' lands to pool at the surface.  Moreover, several courts, including the United States Supreme Court, have dismissed takings claims based solely on a plaintiffs' failure to show intent or foreseeability, regardless of other factors.  *See John Horstmann Co. v. United States*, 257 U.S. 138, 147 (1921) (government's diversion of water from one watershed to another, resulting in flooding and groundwater-level increase that destroyed the value plaintiffs' property, was not a takings because government could not have foreseen plaintiff's loss); *Sanguinetti v. United States*, 264 U.S. 146, 149–50 (1924) (government canal that overflowed onto claimant's land did not constitute a takings because government did not intend to flood the land or have "any reason to expect that such [a] result would follow" from construction of the canal"); *Yawn*, 1 F.4th at 195 (county not liable for taking where destruction of plaintiffs' bees was "not intended or foreseeable"); *see also Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 799 F.2d 317, 326

11

(7th Cir. 1986) ("Accidental, unintended injuries inflicted by governmental actors are treated as torts, not takings."); *Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005) (to succeed on a taking claim, plaintiff "must show either that the government intended to invade a protected property interest or that the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the activity").

Even so, the court will briefly address the remaining *Arkansas Game* factors for the sake of completeness. With respect to duration and severity, plaintiffs state that part of their property stayed wet for extended periods and delayed planting (or prevented it altogether) for five years. The soil conditions certainly affected plaintiffs' reasonable expectations, particularly given the character of plaintiffs' lands as farmland. On the other hand, plaintiffs concede that they have no evidence regarding the amount of water that was present on their lands, or the extent or duration of any saturation, because they did not take photographs, videos or logs of the pooling incidents. They also admit that the amount of water on their fields varied, depending on the year and season, and they have no evidence to distinguish between water-logged soils at a particular time caused by groundwater seepage, as opposed to heavy rainfalls or flooding, including that experienced county-wide in 2018. Finally, the evidence shows that soil saturation and pooling problems have been resolved with field tiles, with no evidence of long-term consequences to plaintiffs' lands.

In contrast, the severity, duration, reasonable expectations and characteristics of the land all favored the plaintiff in *Arkansas Game*. First, the flooding was intentional, consistent and well documented, as the Corps methodically released massive, additional quantities of water directly into hardwood forests that had been managed sustainably for decades under the

Corps' previous, lower water-release plan.  Thus, the Corps' decision to alter its release plan for

six years in a row unquestionably destroyed parts of those forests and "substantial[ly]

change[d] the character of the terrain." *Arkansas Game & Fish Comm'n*, 568 U.S. at 29.  Further,

the destruction of these trees led to the invasion of undesirable plant species, making natural

regeneration of the forests improbable in the absence of substantial reclamation efforts.  *Id.* at

30.   In sum, the evidence supported a finding that the Corps' actions led to intentional,

foreseeable, severe and enduring consequences.  As discussed, the record here supports no such

finding or even reasonable inference.  Therefore, the County is entitled to summary judgment

on plaintiffs' Fifth Amendment takings claim.


    II.      **State Law Takings and Nuisance Claims**

        When a district court disposes of all federal claims before trial, the usual and preferred

course is to remand any remaining state claims to the state court.  *Leister v. Dovetail, Inc.*, 546

F.3d 875, 882 (7th Cir. 2008); 28 U.S.C. § 1367(c)(3) ("district courts may decline to exercise

supplemental jurisdiction over a [state law] claim if . . . the district court has dismissed all

claims over which it has original jurisdiction").  This is particularly true where a defendant has

raised specific state law defenses to plaintiffs' remaining claims, including notice of claim,

discretionary immunity and a public policy defense, as the County has here.   Under the

circumstances, the court declines to exercise supplemental jurisdiction over plaintiffs' state law

nuisance claim and will remand that claim to state court.  However, the court will exercise

supplemental jurisdiction over plaintiffs' near identical takings claim under the Wisconsin

Constitution.  Given the parties' agreement that the *Arkansas Game* factors apply equally under

that constitution, judgment will be entered against plaintiffs as to all federal and state constitutional takings claims for the reasons state above.

ORDER

IT IS ORDERED that:

1) Defendant Dane County's motion for summary judgment (dkt. #12) is GRANTED IN PART with respect to plaintiffs' takings claims under the Fifth Amendment of the United States Constitution and the Wisconsin Constitution, and is DENIED IN PART in all other respects under state law.

2) Further, the court DECLINES to exercise supplemental jurisdiction over plaintiffs' state law nuisance claim, and that claim is REMANDED to Dane County Circuit Court for further proceedings.

3) Defendant's motion to exclude expert testimony (dkt. #44) is DENIED AS MOOT.

4) The clerk of court is further directed to enter final judgment accordingly.

Entered July 18, 2023.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge